# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

BRUCE GAGALIS,

                              Plaintiff,

-vs-                                          Case No.  6:04-cv-866-Orl-28KRS

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.

_____

## REPORT AND RECOMMENDATION

### TO THE UNITED STATES DISTRICT COURT

        This cause came on for consideration without oral argument on the Complaint filed by

Bruce Gagalis, seeking review of the final decision of the Commissioner of Social Security

denying his claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration (SSA).  Doc. Nos. 10, 14-15.  This matter has been referred to me for

issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.      PROCEDURAL HISTORY.

        On October 14, 1999, Gagalis filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401 *et seq*., and supplemental security income payments under the

Supplemental Security for Aged, Blind, and Disabled Program (SSI), 42 U.S.C. § 1382 *et seq*.

TR. 276.  Gagalis' claim was denied, initially and upon reconsideration.  Gagalis requested a

hearing before an administrative law judge (ALJ), which was held on November 21, 2001.  TR.

41-77.  Gagalis, who was represented by an attorney, testified at the hearing.  *Id*.

  After considering Gagalis' testimony and the medical evidence presented, the ALJ

concluded that Gagalis was not disabled.  TR. 31.  Gagalis requested review of the ALJ's decision

by the Appeals Council.  On April 19, 2002, the Appeals Council denied Gagalis' request for

review.  TR. 5-6.  Gagalis then sought review in this Court.  *See Gagalis v. Barnhart*, Case No.

6:02-CV-541-ORLJGG (complaint filed May 7, 2002, at doc. no. 1).

  On November 25, 2002, the Court remanded the matter to the Commissioner "to allow the

[ALJ] to re-evaluate [Gagalis'] residual functional capacity and obtain vocational expert testimony

in response to a hypothetical question which accurately reflects the functional limitations resulting

from [his] impairments."  *Id*. at doc. no. 17.  Thereafter, two supplemental hearings were held

before a different ALJ on March 31, 2003, and December 11, 2003.  Gagalis, who was represented

by counsel, testified as did vocational experts Jane Beougher and Joseph Agrusa.  TR. 288-379.

  After considering Gagalis' testimony and the medical evidence presented, the ALJ found

that Gagalis had not engaged in substantial gainful activity since August 31, 1996, his alleged

disability onset date.  TR. 277, 283.[1]  The ALJ concluded that the medical evidence indicated that

Gagalis suffered from "left-sided weakness, a seizure disorder, and an organic mental disorder as

residuals of head injuries . . ."  TR. 278.  The ALJ determined that Gagalis' impairments were

---

[1] The ALJ noted that Gagalis had worked various jobs since his alleged disability onset date, but she concluded that the work Gagalis performed did not constitute substantial gainful activity.  TR. 278.

severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  *Id.*

The ALJ found that Gagalis had the residual functional capacity (RFC) to perform a "significant range" of light work,[2] with the need to avoid exposure to hazards and slight limitations in his ability to understand, remember and carry-out short simple instructions, make judgments on simple work-related decisions and moderate limitations in his ability to understand, remember and carry-out detailed instructions.  TR. 281-84.  The ALJ also noted that Gagalis could "occasionally but not repetitively use his left upper extremity for manipulative activities . . . ."  TR. 284.  In reaching this conclusion, the ALJ found that Gagalis' seizure disorder "has been under control."  TR. 279.

The ALJ further found that Gagalis' allegations concerning the significance of and limitations arising from his symptoms "far exceed the objective medical findings and the opinions of physicians and most specialists in the field of mental health."  TR. 280.  The ALJ gave "minimal weight" to the opinion of Jose M. Suarez, M.D., a psychiatrist who examined Gagalis, concluding that his opinion "is inconsistent with [Gagalis'] lack of treatment for any psychiatric disorders, the clinical and psychometric findings of the specialists in the field of mental health, as well as [Gagalis'] own self-reports as to his activities . . ."  *Id.*  The ALJ also disregarded the

---

[2] Pursuant to 20 C.F.R. § 404.1567(b), light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further provides that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  *Id.  See also* 20 C.F.R. § 416.967(b).

opinion of vocational experts (VE) Thomas Laughman and Jane Beougher, both of whom evaluated Gagalis, finding that their opinions were not persuasive because they did not consider Gagalis' specific work limitations.  TR. 283.  The ALJ relied heavily upon the opinion of David J. Fleischmann, Ph.D., a psychologist, who examined Gagalis on two separate occasions at the request of the SSA.  TR. 280-81.

The ALJ found that Gagalis was unable to return to his past relevant work because those jobs exceeded his RFC. TR. 282.  Based on the testimony of VE Agrusa, the ALJ determined that Gagalis is capable of making a successful adjustment to work that exists in significant numbers in the national economy.  TR. 283.  Consequently, the ALJ concluded that Gagalis was not disabled.  TR. 284.

Gagalis once again requested review of the ALJ's decision by the Appeals Council, which was denied.  TR. 260-63.  This appeal timely followed.  Doc. No. 1.

## II.     JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied Gagalis' request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981 (OASDI), 416.1481 (SSI).  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

Gagalis was born on April 10, 1957.  TR. 290.  Gagalis completed high school and he earned an associate's degree from a junior college.  TR. 291.  Gagalis' past relevant work history

includes work as a property craft worker refinishing furniture and trimming artificial topiaries. TR. 277, 293-98, 350.[3]

In 1972, Gagalis was injured in a pedestrian/automobile accident.  TR. 154, 278.  As a result, Gagalis suffered an intracranial clot, which required surgery.  TR. 154.  Thereafter, Gagalis began to have seizures.  TR. 154.  Gagalis also started experiencing weakness in the left side of his body, and cognitive changes.  TR. 154.  Gagalis has been diagnosed with epilepsy.  TR. 156.

Gagalis was discharged from a job because he did not remember instructions he had been given, and because he misfiled documents that were designated by file numbers.  TR. 299.  He was discharged from another job due to poor attendance.  TR. 324.  He lost another job because of "incorrect behavior."  TR. 157.  He had difficulty getting along with coworkers.  TR. 69, 302-03.

Gagalis was left-handed before the accident, but he learned to use his right hand to write after the accident.  TR. 45-46.  Gagalis did not have full control of the motor functions in his left arm.  TR. 369-70.  He could not type with his left hand.  TR. 370.  Gout also caused his joints to swell, which limited his ability to use his arms or legs for periods of time.  TR. 53.

---

[3] Gagalis also worked part-time for Goodwill Industries performing several odd jobs in 1999 and 2000.  TR. 293-94.  As previously discussed, the ALJ found that this work was not representative of substantial gainful activity.  TR. 278.

Gagalis testified in 2001 that he took dilantin[4] and mysoline[5] for his seizures but that the medication made him drowsy and caused him to lose focus and concentration.  TR. 53, 56.  The seizures increased when he was under stress.  TR. 56, 157.  Gagalis was still taking these medications in December 2003 when his last hearing was held.  TR. 352.  Gagalis stated that he has problems remembering when to take his medication.  TR. 70, 315.  Gagalis also indicated that the medication causes memory loss and causes him to fall asleep several times throughout the day.  TR. 352-53. Gagalis concedes that he does not take his medication on a regular basis.  TR. 151-52.

In 2001 Gagalis suffered another closed head injury when he was attacked and beaten by five men on the way to a grocery store.  TR. 278, 422.  Gagalis experiences sporadic hallucinations.  TR. 74.  Gagalis does not drive due to his seizures.  TR. 292.

During a typical day, Gagalis would awake sometime between 2:00 a.m. and 6:00 a.m.  TR. 58, 312-13.  He would work around the house and spend time visiting with a friend at a laundromat.  TR. 59.  Gagalis has trouble socializing and maintaining friendships with others.  TR. 307, 312.  He is able to take care of his personal hygiene and do limited cleaning and cooking.  TR. 309-10.

In December 1993, Gagalis was examined by Morris T. Bird, M.D.  TR. 154-55.  Dr. Bird noted that Gagalis was not experiencing significant seizure activity, although he had occasional

---

[4] Dilantin is used to treat various types of convulsions and seizures.  *See* MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682022.html (last visited July 13, 2005).

[5] Mysoline is also used to treat various types of convulsions and seizures.  *See* MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682023.html (last visited July 13, 2005).

brief difficulty with movement of his left hand that might represent minor partial seizures.  TR. 155.  Dr. Bird recommended that Gagalis continue taking dilantin and mysoline for his seizure disorder.[6]  Thereafter, Gagalis returned to Dr. Bird's care on several occasions.  In April 1995, Dr. Bird increased the dosage of Gagalis' mysoline prescription.  TR. 152.  Dr. Bird reported that Gagalis was not very faithful in terms of taking his medication.  *Id*.  Nevertheless, his seizures were infrequent.  He noted that Gagalis continued to have clumsiness of his left arm and left facial paresis[7] with mild ocular motility[8] disturbance.  TR. 151.

In 1997, Dr. Bird observed that Gagalis experienced seizure activity when he failed to take his medication.  TR. 151.  Dr. Bird noted that the longest seizure lasted about two minutes.  Dr. Bird reported that Gagalis "continues to exhibit the mild ocular motility disturbance."  *Id*.

On August 13, 1999, Gagalis was examined by Daniel A. Nieves-Quinones, M.D.  TR. 156.  Dr. Nieves-Quinones noted that Gagalis has a "[h]istory of epilepsy, partial, controlled as long as he takes his medications."  *Id*.  Gagalis informed Dr. Nieves-Quinones that he had four or five seizures since his last visit with Dr. Bird in 1997.  Dr. Nieves-Quinones noted that Gagalis had not been taking his medication on a regular basis due to financial considerations.  Dr. Nieves-

---

[6] The record does not disclose precisely when Gagalis began taking these medications. However, Dr. Bird noted that Gagalis had been taking dilantin and mysoline "for at least the past 10 years . . ."  TR. 154.

[7] Slight or partial paralysis.  Medline Plus Medical Dictionary, found online at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited July 13, 2005).

[8] Ocular motility refers to the study of the muscles surrounding the eye and their impact on eye movement.  *See* Gary E. Miller, CRA, Ocular Motility Photography, found online at http://www.opsweb.org/Op-Photo/Extern/Motility/Motility.htm (last visited July 13, 2005).

Quinones reported that Gagalis adjusted his medication to reflect his financial situation. *Id*. In November 2002, Dr. Nieves-Quinones wrote that Gagalis had some cognitive limitations on his ability to be in a work environment, and that it would be difficult for Gagalis to adapt to certain situations and to relate with coworkers. TR. 420.

In January 2000, Gagalis was examined by Alex C. Perdomo, M.D., at the request of the SSA. TR. 157-58. Upon examination, Dr. Perdomo observed that Gagalis had basically no use of his left hand and that he had decreased muscle strength in his left arm. TR. 158. Dr. Perdomo's impression was that Gagalis suffered from status-post right-sided cerebral hematoma[9] with left-sided hemiparesis,[10] seizure disorder, gout and probable neurapraxia[11] of the left upper extremity. TR. 158. Dr. Perdomo noted that Gagalis' seizures were usually limited to one or two episodes per year. TR. 157. Dr. Perdomo opined that Gagalis could perform well in a job that required limited use of the left arm, provided that seizure precautions were in place. TR. 158.

On February 24, 2000, V. Stone, M.D., reviewed Gagalis' records and prepared an RFC assessment at the request of the SSA. TR. 159-66. Dr. Stone opined that Gagalis could lift twenty pounds occasionally and ten pounds frequently, and that he could sit, stand or walk six hours a

---

[9] A hematoma is "[a] localized mass of ex-travasated blood that is relatively or completely confined within an organ or tissue, a space, or potential space[.]" STEDMAN'S MEDICAL DICTIONARY 772 (26th ed. 1995) (STEDMAN'S).

[10] Hemiparesis is defined as weakness affecting one side of the body. STEDMAN'S at 775.

[11] Neurapraxia is "[t]he mildest type of focal nerve lesion that produces clinical deficits . . ." STEDMAN'S at 1199.

day.  He had limited ability in reaching overhead, handling and fingering on his left side.  TR. 162.

He should avoid hazards due to his seizure disorder.  TR. 163.

On April 21, 2000, Gagalis was examined by Dr. Fleischmann at the request of the SSA.

TR. 167-69.  Dr. Fleischmann noted that Gagalis "has residual left side motor weakness" and

"residual nerve damage in his left eye, now with a 'lazy eye' condition."  TR. 167.  Dr.

Fleischmann reported that Gagalis scored in the average range on the Wechsler Memory Scale

Form I test.  TR. 169.  Dr. Fleischmann concluded that Gagalis' learning abilities were not

impaired.  His impression was that Gagalis suffered from chronic adjustment disorder and

dependant and avoidant personality traits.  Dr. Fleischmann opined that Gagalis' residual

symptoms from his head injury in 1972 "appear to be the basis of his adjustment difficulties."  TR.

169.

In May 2000, Timothy D. Foster, Ph.D., reviewed Gagalis' records at the request of the

SSA.  TR. 170-78.  In sum, Dr. Foster opined that Gagalis suffered from an adjustment disorder,

but he found no functional mental limitations.  TR. 171, 173.

On June 11, 2000, Gagalis sought treatment at an emergency room in Ocoee, Florida, for

headaches, dizziness and vomiting.  TR. 222-26.  Gagalis was diagnosed with seizure disorder.

TR. 224.

On September 7, 2000, Gagalis was examined by James D. ZeBranek, Jr., D.O.  TR. 179-

81.  Dr. ZeBranek noted that Gagalis had lost thirty pounds in the last six months and that he had

positive anosmia.[12]  TR. 179.  Dr. ZeBranek observed that Gagalis had decreased sensation in his

---

[12] Anosmia is defined as the loss of the sense of smell.  STEDMAN'S at 95.

left lower extremity, decreased motor strength at the left elbow extensor, and mild fatigue in the left upper extremity.  TR. 180.  Dr. ZeBranek's impression was that Gagalis suffered from, among other things, left hemiparesis with decreased coordination and manual dexterity, cranial nerve 3 ocular motor palsy with strabismus[13] on the right and post traumatic seizure disorder, controlled. *Id*.  He recommended vocational counseling for "repetitive simple focused occupational pursuits that have no opportunity to present perturbation.[14]"

Shortly thereafter, Gloria B. Hankins, M.D., reviewed Gagalis' records and prepared an RFC assessment at the request of the SSA.  TR. 182-89.  Dr. Hankins opined that Gagalis could lift twenty pounds occasionally and ten pounds frequently, and that he could sit, stand or walk six hours a day.  TR. 183.  He could only occasionally reach and perform fine manipulation with his left hand.  TR. 185.  Dr. Hankins noted that Gagalis suffered from a seizure disorder and that he should avoid all exposure to hazards.  TR. 186.

On September 16, 2000, Pamela Green, Ph.D., reviewed Gagalis' records at the request of the SSA and prepared a psychiatric review.  TR. 190-202.  Dr. Green noted that Gagalis had an adjustment disorder with physical components.  She opined that Gagalis had mild limitations in maintaining social functioning, concentration, persistence or pace and partaking in activities related to daily living.  TR. 193, 200.

---

[13] Strabismus is defined as "[a] manifest lack of parallelism of the visual axes of the eyes." STEDMAN'S at 1682.

[14]  Perturbation in this context appears to refer to events that would cause mental agitation. *See* WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1447 (1996).

On August 13, 2001, VE Laughman evaluated Gagalis and provided a vocational assessment.  TR. 217-20.  After interviewing Gagalis and reviewing medical records, Laughman opined that Gagalis had the functional capacity to perform light work.  However, he concluded that Gagalis would be unable to maintain gainful activity "as a result of marked mental deficiency related to poor concentration, tangential thought process, emotional lability and deficits of concentration and persistence."  TR. 219.  Laughman noted, among other things, that although Gagalis worked for a period of time, "he has regressed to a point where his involvement in the labor force is not reasonable."  TR. 220.  He noted that even in the sheltered environment of work at Goodwill Industries, Gagalis was incapable of meeting work requirements due to inappropriate behavior.  TR. 220.

In May 2001, David Liebert, M.D., examined Gagalis' records and performed a physical functional capacity evaluation.  TR. 230-34.  Gagalis reported that it had been two years since he had a seizure, but that he had frequent instances when he "'goes blank.'"  TR. 230.  Dr. Liebert noted that Gagalis still had mild left residual facial paresis and mild clumsiness involving the left upper extremity.  TR. 230.  He had decreased fine motor ability in his left hand and arm.  TR. 231.  Dr. Liebert opined that Gagalis could lift twenty pounds frequently, stand or walk six hours a day, and sit for eight hours a day.  TR. 233.  Dr. Liebert observed that Gagalis was unable to use his hands or feet for several repetitive functions, such as grasping and pushing, that he could only bend, kneel, squat, crawl and climb stairs occasionally, and that he could never climb ladders.  TR. 234.

On June 11, 2001, Dr. Suarez performed a psychiatric examination on Gagalis.  TR. 235-46.  Dr. Suarez noted that Gagalis had trouble sleeping and that he felt hopeless, helpless and worthless.  Dr. Suarez further noted that Gagalis admitted hearing voices calling his name at night. Dr. Suarez observed that Gagalis' immediate memory was poor and that his judgment and insight were limited.  TR. 236.  Dr. Suarez opined that Gagalis suffers from, among other things, major depressive disorder, single episode, with psychotic features, and an amnestic disorder.  Dr. Suarez further opined that Gagalis "is emotionally disabled and . . . suffers severe memory deficits which render him unable to get any gainful employment which requires memorizing simple instructions." TR. 237.  He opined that Gagalis would have marked limitations in the areas of social interaction, sustained concentration and persistence, and adaptation.  TR. 239-40.  He also had marked restrictions in activities of daily living and maintaining social functioning, frequent deficiencies of concentration, persistence or pace, and repeated episodes of decompensation.  TR. 245.  Dr. Suarez noted that Gagalis' condition was likely to deteriorate if placed under stress, particularly that of a job.  TR. 240.

In August 2003, Dr. Fleischmann again examined Gagalis at the request of the SSA.  TR. 421-26.  Dr. Fleischmann administered several tests from the Wechsler Memory Scale Third Edition (WMS-III) to assess Gagalis' immediate memory functioning.  Gagalis obtained an Immediate Memory Standard Score of 69, which is in the significantly impaired range.  TR. 423. Gagalis obtained an Auditory Memory Standard Score of 77 and a Visual Immediate Memory Score of 71, both of which are in the borderline range.  *Id*.  Dr. Fleischmann noted that these test results showed a significant decline in Gagalis' condition since he first evaluated him in April

2000.   His impression was that Gagalis had dysthymia,[15] a cognitive disorder not otherwise specified, and some avoidant and dependent personality traits.  TR.  423.  He opined that Gagalis has only slight limitations in his ability to understand, remember and carry-out short simple instructions and make judgments on simple work-related decisions.  TR. 425.  Dr. Fleischmann further opined that Gagalis has moderate limitations in his ability to do the following:  understand, remember and carry-out detailed instructions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. TR. 425-26.

Between April and November, 2003, Gagalis was treated at an Epilepsy Clinic.  TR. 427-47.  The records reflect Gagalis' complaints of often or always feeling sleepy, TR. 431, 440.  However, the treating physician noted in November 2003, that a change in medication had relieved the problem with drowsiness.  TR. 430.

At the first supplemental hearing that was held on March 31, 2003, the ALJ presented the following hypothetical question to VE Beougher:

> [A]ssume I have an individual who is 46 years of age.  He has a twelfth-grade education and an associate's degree in arts, but no particular area of expertise. . . . Okay, the hypothetical individual I just described with the past relevant work we've discussed.  I'm going to first assume that the individual could lift and/or carry up to 20 pounds occasionally, 10 pounds frequently.  Stand and/or walk for about six hours in an eight-hour day.  Sit for six hours in an eight-hour day.  And he can occasionally, but not repetitively, use

---

[15]  Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." STEDMAN'S at 536.

> his upper left extremity for manipulative activities.  And he should
> avoid all exposure to hazards.  He has no limitation with his right
> upper extremity, and he could use his left arm as a helper.

TR. 326, 333.  VE Beougher testified that this individual could do Gagalis' past relevant work as

an inventory clerk.  TR. 333.  He could also perform other jobs including photocopy operator and

ticket seller.  TR. 334.  With the added limitation of only using his left arm for reaching, VE

Beougher testified that the individual could not perform the photocopy operator job.  TR. 335.  He

also could not work as a ticket seller because he would need to use both hands to reach or count

money.  TR.  336.  With the additional restriction of extreme limitations in the ability to perform

certain enumerated work activities, such as working with others, accepting instructions, and

working at a consistent pace, VE Beougher testified that there would be no jobs the individual

could perform.  TR. 336-37.

At the supplemental hearing that was held on December 11, 2003, the ALJ presented the

following hypothetical to VE Agrusa:

> [A]ssume that I have an individual who is 46 years of age, who has the education
> and past relevant work as described for the Claimant.  First, I'm going to assume
> that the individual could lift or carry up to 20 pounds occasionally, 10 pounds
> frequently.  Stand and/or walk for about six hours in an eight-hour day.  Sit for six
> hours in an eight-hour day.  He can occasionally but not repetitively use his upper
> left extremity for manipulative activities.  He should avoid all exposure to hazards.
> . . .  Occasionally use his left arm for reaching in all directions, including overhead.
> And fingering, fine manipulation. . . . [H]e has slight limitations in his ability to
> understand, remember short simple instructions, and in the ability to carry out short
> simple instructions, as well as in the ability to make judgments on simple work-
> related [d]ecisions.  Slight is defined as there's some mild limitation in the area, but
> the individual can generally function well.  Moderate limitations in the ability to
> understand and remember detailed instructions, and carry out detailed instructions,
> as well as interact appropriately with the public, interact appropriately with
> supervisors, coworkers, and the ability to respond appropriately to work pressures
> and unusual work setting, and respond appropriately to changes in a routine work

-14-

setting.  Moderate is defined as has a moderate limitation in the area, but the
individual is still able to function satisfactorily.

TR. 364, 366-67.

The VE responded that Gagalis would not be able to return to his past relevant work.

Nevertheless, the VE opined that Gagalis would be able to perform several jobs that exist in

significant numbers in the national economy and Orlando area, namely, cashier, ticket taker and

sales attendant.  TR. 365-67.  With respect to the number of available jobs, he testified as follows:

| Type of Job | Number Available in Orlando | Number Available Nationally |
|---|---|---|
| Cashier | 7,300 | 2.9 million |
| Ticket Taker | 1,850 | 146,000 |
| Sales Attendant | 3,700 | 1.7 million |

TR. 365.

## IV.    STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether

the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the

correct legal standards.  *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1987) (per curiam).

While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of

validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards

to be applied in evaluating claims."  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per

curiam).

The Court must view the record as a whole, taking into account evidence favorable as well

as unfavorable to the SSA's decision.  *Id*. at 1000.  Even if the Court finds that the evidence

weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11ᵗʰ Cir. 1990). The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*. When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI or SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."[16] Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI or SSI benefits. In sum, when evaluating a claim for benefits under OASDI or SSI, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

---

[16] 42 U.S.C. §§ 423(d)(1)(A) (OASDI), 1382c(a)(3)(A) (SSI). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalcies which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

(5) Is the claimant unable to perform any other work within the economy?[17]

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."[18]

## V.    ANALYSIS.

Gagalis raises two issues on appeal.  First, Gagalis contends the ALJ erred by failing to pose a complete hypothetical to VE Agrusa based on all of his impairments.  Consequently, Gagalis posits that the ALJ's determination that he was capable of making a successful adjustment to work that exists in significant numbers in the national economy is not supported by substantial evidence.  Second, Gagalis argues that the ALJ erred by failing to strike the VE's testimony because the VE did not have the Bureau of Labor Statistics data with him regarding the precise number of jobs that he stated exist in significant numbers in the national economy and the local area.  These are the only issues I will address.[19]

---

[17] 20 C.F.R. §§ 404.1520(a)(4) (OASDI), 416.920(a)(4) (SSI).  In SSI cases, a claimant must also meet financial eligibility requirements.  *See* 20 C.F.R. § 416.202.  In OASDI cases, a claimant must establish that he was disabled during the time that he was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

[18] *See, e.g., McDaniel*, 800 F.2d at 1030.

[19]  Gagalis was advised that "[a]ny issue not specifically raised by the plaintiff will be considered to have been waived unless the interests of justice require the Court to consider the issue."  Doc. No. 11 at 2.

    A.    *Adequacy of the Hypothetical Question*.

Once a claimant establishes that he can no longer perform his past relevant work, "the burden shifts to the Commissioner 'to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.'" *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (quoting *Hale v. Bowen*, 831 F. 2d 1007, 1011 (11th Cir. 1987)).  As previously discussed, the ALJ determined that Gagalis was unable to return to his past relevant work because those jobs exceeded his RFC.  Thus, the ALJ appropriately called a VE to testify as to whether Gagalis, given his limitations, was capable of performing other jobs in the national economy.

It is well established that "[i]n order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Id*.  Gagalis contends that the hypothetical question posed to VE Agrusa was incomplete because it did not refer to his seizure disorder and organic mental disorder as a result of head injuries.  He also contends that the hypothetical failed to include limitations in his ability to deal with perturbation at work, the need for any job to have precautions in the event he suffered a seizure, his visual and auditory difficulties, and the side effects of his medication.  The Commissioner asserts that the hypothetical question was proper because it included all of the functional limitations that the ALJ found to be supported by substantial evidence in the record.

It is correct that the ALJ did not ask the VE Agrusa to assume that Gagalis had specific impairments.  However, knowledge of the underlying impairments would not aid the vocational expert in assessing Gagalis' ability to work.  Rather, it is the functional limitations arising from the

impairments that are important to the vocational expert's assessment.  One court described the distinction as follows:

> Broadly speaking, it is the office of the ALJ, utilizing medical and other evidence, to determine the plaintiff's impairments and the functional limitations they impose.  Once the ALJ has done so, it is the task of the vocational expert to offer opinion testimony concerning the availability of employment to one possessing the functional limitations described by the ALJ.

*Howell v. Halter*, No. Civ.A. 00-00348-CB-S, 2001 WL 936110, at *2 (S.D. Ala. May 8, 2001), *aff'd without opinion*, 31 Fed. Appx. 932 (11th Cir. Jan. 17, 2002); *see also Wind v. Barnhart*, No. 04-16371, 2005 WL 1317040 (11th Cir. June 2, 2005) (hypothetical question complete even though it did not specify the impairments that supported the functional limitations that were included in the question).  Therefore, if the hypothetical question posed to VE Agrusa contained all of the functional limitations supported by substantial evidence in the record, it was not error for the ALJ to omit from the hypothetical question the underlying seizure and organic mental disorders that caused the functional limitations.

Turning next to the completeness of the functional limitations in the hypotheticals, Gagalis contends that the ALJ erred by omitting functional limitations arising from significant difficulty in auditory and memory processes, perturbation limitations and seizure precautions.  However, the record reflects that the ALJ included all of these functional limitations in the hypotheticals posed to VE Agrusa.  Dr. Fleischmann identified Gagalis' difficulties in auditory and memory processing.  He opined that Gagalis' impairments resulted in slight limitations in certain areas and moderate limitations in other areas, as discussed above.  The ALJ included in her hypothetical question to VE Agrusa all of the functional limitations identified by Dr. Fleischmann.  By doing

so, she adequately accounted for functional limitations arising from Dr. Fleischmann's assessment that Gagalis had significant difficulty in auditory and memory processes.

The hypothetical question also addressed functional limitations arising from Gagalis' difficulty working at jobs that would present perturbation, which I construe to mean jobs that would cause mental agitation, such as jobs involving work pressure or stress.  Included in the hypothetical was Dr. Fleischmann's assessment that Gagalis would have moderate limitations in the ability to respond appropriately to work pressures.   Once again, the hypothetical is not incomplete simply because it did not use the word perturbation.

Gagalis is correct that the ALJ did not ask the VE to assume that the hypothetical individual needed precautions in the event of seizures.  However, she did include in the hypothetical question the assumption that the individual should avoid all exposure to hazards, which is the seizure precaution supported by the record. *See, e.g.,* TR. 163, 186.

Finally, with respect to side effects of medication, Gagalis testified that his seizure medication makes him drowsy, causes him to lose focus and concentration, and impairs his memory.   The difficulties with focus, concentration, and memory were adequately addressed by the functional limitations articulated by Dr. Fleischmann, which the ALJ incorporated into the hypothetical questions posed to VE Agrusa.  There is not substantial evidence in the record that Gagalis had functional limitations arising from the side effects of his medication.  The only medical reference cited by Gagalis is the notation in the records of the Epilepsy Clinic that he had drowsiness.  However, the same clinic records indicate that this problem was resolved by adjustment in medication.  This is consistent with the ALJ's determination that Gagalis' testimony

-20-

about the functional limitations he suffered was not fully credible because his complaints far exceed the medical findings and opinions of physicians and most mental health specialists.[20] When, as here, substantial evidence does not support a claimed functional limitation, the ALJ is not required to include it in the hypothetical question. *See McSwain v. Bowen*, 814 F.2d 617, 619-20 n.1 (11th Cir. 1987).

Accordingly, the hypotheticals posed to VE Agrusa, upon which the ALJ relied in reaching her decision, presented a complete assessment of the functional limitations on Gagalis' ability to work that the ALJ found to be supported by substantial evidence in the record. As such, it was not error for the ALJ to rely on VE Agrusa's opinion about the jobs available that Gagalis could perform.

B.   *Failure to Require VE to Produce Bureau of Labor Job Statistics.*

VE Agrusa testified at the December 11, 2003, hearing that several jobs exist in significant numbers in the national economy and local area that Gagalis was capable of performing. Gagalis' attorney moved to strike the testimony when VE Agrusa was not able to produce the Bureau of Labor Statistics data upon which he relied to identify the number of each type of job available. TR. 376. Gagalis contends that the ALJ erred by relying on VE Agrusa's opinion because Gagalis' attorney was not able effectively to cross-examine the VE in the absence of the underlying data.

Gagalis cites no authority to support his argument that a VE's testimony should not be relied upon unless the VE can provide documentary support for each of his opinions. Further, I

---

[20]   Gagalis did not specifically challenge this credibility finding in his memorandum of law.

note that the ALJ kept the record open for Gagalis to submit additional information, TR. 379, but he did not supplement the record with evidence suggesting that VE Agrusa's testimony about the number of jobs available was not well founded.  Under these circumstances, I conclude that the motion to strike was not well taken and that the ALJ did not err in relying on the vocational expert's opinion.

## VI.    RECOMMENDATION.

Based on the foregoing reasons, I respectfully recommend that the decision of the Commissioner be **AFFIRMED**.  I further recommend that the Court enter judgment consistent with its order on this Report and Recommendation and, thereafter, direct the Clerk of Court to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 19th, 2005.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Parties
District Courtroom Deputy